United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERIC ANTHONY PARKER,

        Petitioner,

  v.

JAMES E. TILTON, Acting Secretary,
California Department of Corrections and
Rehabilitation,

        Respondent.
                                             /

No. C 00-04064 WHA

**ORDER DENYING
PETITION FOR
WRIT OF HABEAS CORPUS**

## INTRODUCTION

This case illustrates one of the frailties in federal habeas practice. It is the ease with which conclusory statements can be obtained from supposedly overlooked witnesses to win an evidentiary hearing with all its attendant expense only to learn that the conclusory statements collapse on closer examination. This habeas action was remanded by the Court of Appeals to hold an evidentiary hearing on the alleged failure of trial counsel to investigate and to present an alibi defense in petitioner's murder trial. This remand was provoked by short witness statements that, if fully credited, seemed to create an alibi defense arguably neglected at trial. Trial counsel was Robert Beles of Oakland. At the evidentiary hearing, petitioner's habeas counsel — A.J. Kutchins and Alex Reisman — not only argued that Attorney Beles had been ineffective but also argued that Attorney Beles had perjured himself and falsified phony records to cover his tracks.

1    This order finds that Attorney Beles provided effective assistance, that the alleged alibi
2 was no alibi at all, that Attorney Beles' records are genuine and not forged, and that
3 Attorney Beles was truthful in his testimony. The only inaccurate records submitted in this case
4 were submitted by petitioner's counsel in the form of lawyer-prepared alibi statements by
5 Ramont Johnson. On the stand, Mr. Johnson repudiated them. The alibi, at least via
6 Mr. Johnson, evaporated. The details now follow.

**PROCEDURAL HISTORY**

8    Petitioner was convicted by a unanimous jury of first-degree murder on March 22, 1995.
9 On the afternoon of February 7, 1994, Freddie Williams was shot and killed at a neighborhood
10 intersection in Oakland, California. A bystander, Logan Johnson, was also struck by a bullet
11 but he survived. Four teenage witnesses — Lewis Dunbar, James Dunbar, Kehinde Riley and
12 Deron Kincaid — gave statements implicating petitioner to Oakland Police Sergeant
13 Sharon Banks shortly after the shooting.

14    Each of the four witnesses told Sgt. Banks that he saw petitioner drive up to a group of
15 men playing dice on the corner of Seminary Avenue and Hayes Street in Oakland.
16 Freddie Williams was in the group. Lewis Dunbar told Sgt. Banks that petitioner got out of the
17 vehicle and said to Williams, "Fred, nigger, what's wrong with you saying you gonna down my
18 sister." Williams started to run. Petitioner shouted, "Down that nigger," at which point a
19 passenger in petitioner's car pulled out a semi-automatic weapon and fired several rounds
20 hitting both Williams and Logan Johnson, who had also tried to run from the scene.
21 Witnesses reported hearing twenty to fifty shots.

22    After the shooting, Lewis Dunbar positively identified petitioner at both a photographic
23 and physical lineup. James Dunbar and Kehinde Riley made positive photo identifications of
24 petitioner. Deron Kincaid positively identified petitioner in a physical lineup but provided only
25 an equivocal identification of petitioner in a photo lineup.

26    At trial, each of the four witnesses recanted his statement, at least in part. Lewis Dunbar
27 initially testified that he could not remember giving a taped statement to Sgt. Banks.
28 Lewis Dunbar eventually stated that he gave a statement because he wanted to avoid being

charged with a probation violation. He further stated he only chose petitioner at both the photographic lineup and the physical lineup because he knew who petitioner was (RT 328, 372).[1]

James Dunbar testified that he remembered nothing about the shooting or giving a statement to Sgt. Banks. He also testified that he remembered nothing about an interview with Inspector Brock or deputy district attorney Alyce Sandbach in the month before the trial (RT 562–63, 744).

Kehinde Riley testified that he did not see who the shooter was. At the time of the shooting, he was in the back of the corner liquor store located at the intersection where the shooting took place when Freddie Williams was killed. Because of this, he could not see the shooter. He could not remember telling the officers various inculpatory statements about petitioner (RT 930, 942).

Deron Kincaid testified that he was also in the back of the store when the shooting occurred. Kincaid admitted giving a statement to the police. Kincaid was unsure whether the shooter was one of two possible photographs in the photographic lineup. At the physical lineup, Kincaid said that he only picked petitioner because a defense attorney had previously shown him petitioner's picture. He did ultimately testify that he heard petitioner say, "Down that nigger," just before the passenger in petitioner's car started firing (RT 424, 438, 450, 501).

Petitioner did not testify at trial. The defense focus was on the credibility (or lack thereof) of the prosecutor's four eyewitnesses. The defense also called five witnesses, one of whom was Oakland Police Officer John Parkinson. He testified that he told Kehinde Riley that if Riley helped the police with the murder investigation, the police might be able to assist with a pending drug prosecution against him (RT 1109). Two other witnesses were relatives of petitioner, Bruce Watson (uncle-in-law) and Clara Parker (grandmother). They both testified that petitioner's hair was not worn in the "jerry curl" style described by the eyewitnesses to the shooting. Instead, they testified that petitioner had short hair at or about the time of the

---

[1] Unless otherwise noted, the following facts about the trial are taken from the opinion of the state appeals court. References herein to "RT" are to the reporter's transcript on appeal.

3

1  shooting and identified contemporaneous photos so indicating (RT 1138–44). The defense next
2  called Robert Byers, an associate in defense counsel's law office. He also worked as a defense
3  investigator on the matter. He attended the physical lineup at which petitioner appeared
4  following his arrest. Byers testified that the police officer conducting the lineup had never
5  asked the witnesses to identify anyone involved in the crime but rather only asked them to
6  identify someone "you know" (RT 1163). The final defense witness was Michael Davis,
7  the courtroom bailiff. He was called to dispute Deron Kincaid's trial testimony that petitioner
8  had winked at Kincaid during Kincaid's testimony (RT 1168–69). A unanimous jury convicted
9  petitioner of first-degree murder on March 22, 1995. He was sentenced to a prison term of
10 thirty years to life imprisonment.

11 Following his conviction, petitioner pursued almost all avenues of appeal open to him.
12 He first appealed his criminal conviction to the California Court of Appeal. Petitioner's
13 grandmother retained the services of attorney Maureen Kallins to represent petitioner in his
14 state appeal. Ms. Kallins and members of her firm filed declarations from several allegedly
15 overlooked witnesses. Petitioner's conviction was affirmed by the California Court of Appeal
16 on September 30, 1996. In denying petitioner's appeal, the appellate court dismissed
17 petitioner's ineffective assistance of counsel claim. Other claims rejected covered an alleged
18 failure to investigate and to present an alibi defense as well as claims related to a plea offer and
19 a claim that defense counsel should have argued for manslaughter or murder in the second
20 degree. The California Court of Appeal did remand on one discrete issue regarding sentencing.
21 On remand, the trial judge enhanced defendant's sentence by adding one year of incarceration
22 to his original sentence. When petitioner appealed the trial court's second judgment, the
23 appellate court struck the sentencing enhancement but affirmed the verdict. Between his first
24 and second appeal, petitioner unsuccessfully sought habeas relief in both the superior court and
25 the appellate court. Ms. Kallins represented petitioner until Mr. Stephen Bedrick took over
26 petitioner's appeal to the California Supreme Court. On February 18, 2000, petitioner filed a
27 habeas corpus petition in the California Supreme Court; Bedrick was his counsel in the matter.
28 That petition was denied on April 26, 2000.

4

Representing himself, petitioner filed the instant habeas corpus petition on November 2, 2000. Petitioner remained without counsel for two-and-a-half years. On March 4, 2003, Attorney A.J. Kutchins was retained as counsel for petitioner and appeared as counsel in place of petitioner. Counsel filed a traverse on January 16, 2004, a supplemental traverse on February 23, 2000, and a second supplemental traverse on July 16, 2004. Petitioner's claims included an ineffective assistance of counsel claim. This was based upon petitioner's allegations that counsel failed to investigate and to present an alibi defense, failed to present impeachment witnesses, and failed to notify the trial court of alleged juror misconduct. Petitioner also alleged due process claims based upon an alternate juror's alleged bias and a juror's alleged refusal to deliberate. Petitioner requested an evidentiary hearing.

This Court denied the petition on August 31, 2004, finding that petitioner's trial counsel had not been ineffective counsel, and that his due process rights had not been violated. The order held that an evidentiary hearing was not necessary because petitioner had not presented any additional facts that would entitle him to relief. Petitioner appealed. While preparing his appeal, petitioner submitted an application to proceed *in forma pauperis*, which was granted by this Court. A.J. Kutchins, who had initially been retained by petitioner's family, became petitioner's court-appointed counsel under the Criminal Justice Act in December 2004.

The Ninth Circuit affirmed in part, reversed in part, and remanded "with instructions to hold an evidentiary hearing on the ineffective assistance of counsel claim for failure to investigate and present a potential alibi defense." The Ninth Circuit held that the record did not contain sufficient evidence to evaluate whether or not the California court's application of federal law to the ineffective assistance of counsel claim was reasonable. *Parker v. Woodford*, 168 Fed. Appx. 152, 154 (9th Cir. 2006).

On remand, A.J. Kutchins requested appointment of a second trial counsel under the Criminal Justice Act. This was on the theory that Mr. Kutchins was an appellate layer and needed help examining the witnesses. This Court granted the request, leading to the

5

1  appointment of Mr. Alex Reisman as a second CJA counsel. Both counsel examined witnesses
2  at the hearing.

3  Considerable resources were invested in the evidentiary hearing. Two state deputies
4  were needed to guard petitioner. Also in the courtroom were federal marshals needed to
5  prevent any escape by witness Ramont Johnson, in federal custody after a federal bank-robbery
6  conviction. Two state deputy attorney generals worked for respondent. Two CJA lawyers
7  worked for petitioner. The court staff and facilities were devoted to the proceedings.
8  Leading up to the hearing were various depositions with their attendant expense. The hearing
9  covered three days with post-hearing briefing based on hearing transcripts.

10  The evidentiary hearing addressed the alibi issue and whether trial counsel had been
11  ineffective in investigating the alibi before deciding not to use it at trial. In all, seven witnesses
12  were presented: Ramont Johnson, who allegedly had been with petitioner "all afternoon;"
13  Betty Bello, a witness to the shooting and instigator of the telephone chain leading to
14  petitioner's alleged alibi; Lakeisha Wade, petitioner's girlfriend; Robert Byers, who worked for
15  petitioner's trial counsel; and, as rebuttal witnesses, two attorneys involved in petitioner's
16  appeal — Seth Schalit and Stephen Bedrick. Respondent called petitioner himself, and
17  Attorney Robert Beles, petitioner's defense counsel at the original trial. The deputy district
18  attorney who brought the case to trial originally was Ms. Alyce Sandbach; she was unable to
19  attend the evidentiary hearing. The parties stipulated to the admission of Ms. Sandbach's
20  deposition as her testimony.

**FINDINGS**

22  The supposed alibi defense revolved around two themes. Theme One was that petitioner
23  had been with an alibi witness "all afternoon" eleven blocks away from the murder scene.
24  Theme Two was that petitioner was eleven blocks away from the murder scene talking on the
25  phone to his girlfriend very shortly after the murder. The problem with Theme One turned out
26  to be that the supposed alibi witness repudiated his alibi statement. The problem with
27  Theme Two was that the timing did not work. The alleged phone call could not be established
28  with sufficient specificity to rule out the possibility that petitioner had committed the murder

6

1  and returned to the apartment in question (only eleven blocks away) before the call was made.
2  In fact, this order finds that there was ample time to have done both. Other drawbacks to
3  Theme Two proved substantial and are presented below.

4  Let's start with the simplest part — Ramont Johnson and Theme One. At the
5  evidentiary hearing, petitioner called Mr. Johnson to vouch for his whereabouts on the
6  afternoon in question.[2] Mr. Johnson testified that he was living with his family in the same
7  apartment building as Geraldine Ford, his mother-in-law. Geraldine Ford was also petitioner's
8  godmother. Petitioner would visit the building from time to time. Mr. Johnson and Ms. Ford
9  both lived on the second floor of the apartment building; Mr. Johnson's unit was at the end of
10 the hall while Ms. Ford's was the first unit at the top of the stairs.

11 On the day in question, Mr. Johnson was "hanging out" with petitioner — they were
12 shooting dice in front of the apartment building. Mr. Johnson could not recall if they were
13 hanging out during the morning or afternoon but recalled that they were going between the
14 apartments. As he admitted, Mr. Johnson was not a witness to any call between petitioner and
15 his girlfriend. Amazingly, Mr. Johnson stated that petitioner *could have* left the apartment
16 building without Mr. Johnson's knowledge. In direct contradiction to his lawyer-prepared
17 declarations (relied on by the Ninth Circuit to require an evidentiary hearing and referenced in
18 footnote 2), Mr. Johnson testified that they were together only "on and off" that day and that

---

[2] Mr. Johnson's supplemental declaration to his 1996 declaration stated: "I, Ramont Johnson, declare as follows: I am acquainted with Eric Parker, and, as set out in my previous declaration on his behalf, which I signed in April, 1996 (and have recently reviewed), I was with him during the entire afternoon of February 7, 1994. If called as a witness at Mr. Parker's trial, I would have so testified. I was never contacted by Eric Parker's trial lawyer, Robert Beles, or by anyone then working for Mr. Beles, and, to the best of my knowledge, I never had any conversation with Mr. Beles or anyone working for him. If called as a witness, I would testify to all of these things in a court of law. I declare under penalty of perjury that the foregoing is true and correct. Executed at Oakland, California, this 11 day of June, 2004."

This declaration was prepared by Attorney Kutchins. The Court accepts his representation that it was "consistent" with what the witness had told him earlier.

The earlier lawyer-prepared declaration by the same witness stated that Mr. Johnson lived in Geraldine Ford's apartment building with his family, that he was hanging out with petitioner on the day of the Williams murder and petitioner was with him continuously on that afternoon — he recalled they were shooting dice in front of the apartment and that he recalled they went fishing that evening together.

7

1 petitioner could have gotten in a car and driven off that afternoon without Johnson's
2 knowledge.[3]

3       This order finds that Johnson was *not* with petitioner all afternoon, that they were
4 together only off and on, that petitioner could have left, done the nearby crime, and returned
5 without Johnson being aware of petitioner's absence, and that his lawyer-prepared declarations
6 were in serious error.

7               \*      \*      \*

8       Theme Two relied on a round robin of telephone calls. Petitioner alleges that he could
9 not possibly have been at the murder scene because he was at Geraldine Ford's apartment all
10 afternoon. While there, he supposedly picked up a phone call from his girlfriend
11 Lakeisha Wade so close in time to the shooting as to have excluded the possibility that he had
12 done the murder. The main problem was pinning down when any such call was made.

13       Ms. Betty Bello, a witness to the shooting, began the round robin of telephone calls.
14 From her balcony she could see down to the liquor store near where the shooting took place.
15 At the time of the shooting, Ms. Bello was on the telephone with her mother. Upon seeing and
16 hearing the events, Ms. Bello hung up with her mother and immediately dropped to the ground.
17 She saw a white car "flying" down the street. Ms. Bello then called Ms. Lakeisha Wade.
18 (Ms. Wade was the mother of Ms. Bello's grandchild; Ms. Bello called to make sure they were
19 okay.) On cross-examination, Ms. Bello tried to recall how long it was after the shots were
20 fired that she called Ms. Wade — she repeatedly stated that she could *not* recall how long it had
21 been. She even stated it might have been five or six minutes — she just could not say how long
22 it was.[4] She did not have a long conversation with Ms. Wade on the phone. Ms. Bello was a

---

[3] Although well after the critical time in the case, Mr. Johnson also testified that they went fishing that evening (supposedly because petitioner had never been fishing before). Later, Mr. Johnson was also with petitioner during the early morning hours of May 23, 1994, when petitioner was arrested on an outstanding warrant for his arrest for the Williams murder.

[4] This contrasts sharply with the lawyer-prepared declaration Ms. Bello signed in 1996. Her 1996 declaration stated "I immediately called my daughter-in-law Lakeisha Wade as I watched a white car drive away from the scene."

8

1  credible witness. This order finds that Ms. Bello might have called Ms. Wade as long as five to
2  six minutes after the shooting. This is a critical finding as to timing.

3  Ms. Lakeisha Wade had been petitioner's girlfriend when the murder took place and was
4  still his girlfriend when he was subsequently arrested three-and-a-half months later. Ms. Wade
5  was driving with petitioner the night he was arrested. On the stand, Ms. Wade testified that
6  after receiving the call from Ms. Bello, she called Geraldine Ford's apartment looking for her
7  friend Antoinette Green, who was also petitioner's sister. Petitioner answered the phone, she
8  said. Ms. Wade claims she asked petitioner if Antoinette was home; he responded that she had
9  gone to the store. Petitioner said that he had not heard about the shooting and did not ask
10  Ms. Wade any questions about the shooting.

11  Petitioner and Ms. Wade ultimately split up before the trial; they had an argument before
12  petitioner's trial. Ms. Wade denied that she ever told Attorney Beles that petitioner wanted her
13  to fake an alibi. She did retain an attorney, Bill DuBois, on Attorney Beles' advice because of
14  her concerns about self-incrimination.

15  The Court finds Ms. Wade to be less credible than Ms. Bello. A number of points in the
16  cross-examination suggested that she had a convenient memory and was willing to shade the
17  facts to help petitioner. On cross-examination, Ms. Wade claimed that she had not known that
18  petitioner was wanted for the Freddie Williams shooting even though the two lived together at
19  the time in question and even though petitioner had told his parole officer he knew he was
20  wanted for the Williams shooting. Police notes indicate that Ms. Wade had also told the police
21  on the night of petitioner's arrest that she knew petitioner was wanted for the Williams murder.
22  Ms. Wade admitted to knowing very little about someone she had been living with. To take
23  only one example, Ms. Wade had no idea how petitioner was earning money even though she
24  and petitioner shared a bank account and lived together. It strains belief that Ms. Wade did not
25  know such things about her boyfriend.

26  This order finds that perhaps Ms. Wade did call and perhaps petitioner did answer but
27  what is very clear is that, even if it happened, the call was made too late to help petitioner or,
28  at the very least, its timing could never have been pinned down sufficiently to establish an alibi.

9

1  Ms. Wade herself claims she placed the call *after* Ms. Bello's call.  That could have been as
2  much as five to six minutes after the shooting, plenty of time for petitioner to have left the scene
3  and to have been on the phone only eleven blocks away.
4       Robert Byers was also a witness at the evidentiary hearing.  Mr. Byers worked for
5  Attorney Beles during the relevant time period, and performed some investigative work in
6  preparing for the trial.[5]  He was apparently called to the stand to denigrate trial counsel's
7  investigation.  Mr. Byers told Attorney Beles about Ms. Wade's statement that petitioner had
8  answered the phone at Geraldine Ford's apartment shortly after the shooting and that there was
9  a potential alibi defense.  Mr. Byers and Attorney Beles did discuss the potential alibi.
10  They discussed the chain of phone calls from Ms. Bello to Ms. Wade to Geraldine Ford's
11  apartment where petitioner picked up the telephone.  Mr. Byers testified that he knew
12  Ramont Johnson was connected with the alibi and could account for petitioner's presence that
13  afternoon.  Mr. Byers was vague in his memory.  He had no specific denunciations of trial
14  counsel based on personal knowledge.  That ended petitioner's case in chief.
15       Respondent opened its case by placing petitioner on the stand.  Petitioner admitted that
16  he had not told his attorney, Attorney Beles, about his alibi evidence on the day of the shooting.
17  He said that back then he could not remember where he had been that day.  Discovery provided
18  by the district attorney included a handwritten police report note that Betty Bello had called
19  Ms. Wade at about two in the afternoon and that Ms. Wade had tried to call Antoinette Green
20  but petitioner had answered.  Upon answering, petitioner told Ms. Wade that Ms. Green was at
21  the grocery store and that petitioner had said nothing to Ms. Wade about the murder.
22  After seeing that discovery, petitioner said he then recalled that he had answered Ms. Wade's
23  phone call that day at Geraldine Ford's apartment.  Petitioner, he claims, asked Attorney Beles
24  to present the alibi evidence.  Attorney Beles stated, however, that he would only pursue the
25  single strategy of discrediting the prosecution's evidence and would not pursue the alibi
26  evidence strategy, according to petitioner.

---

[5] Mr. Byers is an attorney.  At the time he worked both as an associate in Attorney Beles' office and performed investigative work for Attorney Beles.  He was the investigator in the instant action.

10

Respondent also called Attorney Robert Beles, whom the Court finds credible in all respects. Attorney Beles confirmed that, as of their first meeting following his arrest, petitioner could not remember where he was on the day of the murder. After the discovery was received and petitioner recollected where he was at the time of the shooting, Attorney Beles looked into the alibi defense. Attorney Beles testified that there were various reasons behind his decision not to present the alibi evidence, and, specifically, not to present Ms. Wade, who was critical to the alibi story.

*First*, Attorney Beles concluded that the alleged alibi did more harm that good. The time frame was too loose and placed petitioner too close to the crime scene. Ms. Bello said that she first heard shots and then called Ms. Wade, who next tried calling Antoinette Green. With the time Ms. Bello needed to process the information that someone had been shot and then having two intervening phone calls before petitioner picked up the phone, Attorney Beles thought the time frame was too nonspecific to be helpful. It was harmful, as stated, because it placed petitioner close to the crime scene. He had picked up the phone *after* the shooting, not *during* the shooting. Attorney Beles knew the neighborhood. It was only 1.1 miles between the scene of the shooting and the apartment. This would have been a three-minute drive at about twenty miles per hour. It could have been as short as two minutes at around thirty miles per hour. It would have been easy for a person to speed. This route had no stop lights. Police did not regularly patrol the route. Attorney Beles did not think it was wise to bring in this evidence. It placed petitioner too close to the murder, closer than the prosecution was otherwise able to establish.

*Second*, Attorney Beles thought it was problematic to place petitioner at Geraldine Ford's apartment. Only a block from the apartment, a stolen white Caprice had been ticketed about forty-five minutes before the shooting. This was likely the getaway car, according to the trial evidence. Additionally, the car was found that evening only two blocks from the apartment. It had been set on fire and was completely burned. There was a .38 slug in the car. The prosecution had only been able to place petitioner at Ms. Wade's apartment, which was

1  farther away than Ms. Ford's apartment.  Placing him even closer would have helped the
2  prosecution.

3      *Third*, a .38 slug was found in the burned car and another .38 slug was found at the
4  crime scene.  Ms. Wade told the police on the night of petitioner's arrest that she saw petitioner
5  with a .38 caliber gun shortly before the shooting.  This would have been more unfavorable
6  circumstantial evidence.  Attorney Beles wanted the number 38 to recede.

7      *Fourth*, Ms. Wade was driving petitioner on the night he was arrested.  He was wearing
8  a bulletproof vest at the time.  Attorney Beles was concerned about the implications of wearing
9  a bulletproof vest — that the jury would think petitioner was afraid of retribution for
10 Freddie Williams' killing.

11     *Fifth*, Ms. Wade had sheltered a fugitive by living with him when she knew that he was
12 wanted by the police.  Ms. Wade knew that petitioner was wanted for the Williams murder
13 (as she told the police on the night petitioner was arrested).  Attorney Beles knew this.

14     *Sixth*, Ms. Wade was phoning Antoinette Green, of all people, to tell her about the
15 shooting.  The alleged murder motive was that Williams had roughed up petitioner's sister,
16 Antoinette Green.  The jury could too easily connect the dots, Attorney Beles thought.

17     *Seventh*, Attorney Beles was also troubled by Ms. Wade's report on her conversation
18 with petitioner.  In the call, petitioner had allegedly told Ms. Wade that Antoinette Green was at
19 the store.  In fact, Antoinette had never made any statements about going to the grocery store.

20     *Eighth,* Ms. Wade was known to be petitioner's girlfriend.  Attorney Beles and the
21 police knew that the two had been dating for a number of years.  Attorney Beles was concerned
22 about the obvious bias, although this factor alone was not unsurmountable.

23     *Ninth*, Ms. Wade told Attorney Beles before the trial that petitioner had asked her to set
24 up a "false alibi" and that she did not want to testify.  To Attorney Beles, Ms. Wade seemed
25 disgusted with petitioner for asking that she do so and that she seemed fed up with him for some
26 reason.  (Ms. Wade also testified at the evidentiary hearing that she had broken up with
27 petitioner at about this time.)  Attorney Beles did not want to put Ms. Wade on the stand
28 because he felt that he would be putting her up as a target for the prosecution.  He would either

12

1  be suborning perjury or, she might have to say, if asked by the prosecution that the defendant
2  had asked her to manufacture an alibi. That would have been catastrophic. Attorney Beles
3  even sent Ms. Wade to another attorney, Bill DuBois, so that she would be able to invoke her
4  Fifth Amendment privilege and escape from testifying if called by the prosecution.

5         Attorney Beles had a sub-file entitled "Lakeisha Wade." The folder had a note on the
6  manila folder itself (along with other notes) made by Attorney Beles that Ms. Wade had told
7  him that petitioner wanted her to testify to a "false alibi." This was produced in discovery in
8  this action. Petitioner's counsel had the original at the hearing. The Court examined the
9  original folder and the original ink note during the evidentiary hearing. The notation had every
10  indication of genuineness. Attorney Beles stated categorically that he made the note before the
11  1995 trial and that Ms. Wade had in fact told him petitioner asked her to testify to a false alibi.
12  The Court finds Attorney Beles' testimony credible and accepts fully his testimony.
13  This testimony was corrobated by the fact, admitted by Ms. Wade, that she was referred to
14  another attorney in the same suite by Attorney Beles. (This was so she could invoke the
15  Fifth Amendment and not have to be called to testify by the prosecution and reveal the
16  false-alibi directive.)[6]

17         Petitioner called two rebuttal witnesses: supervising deputy attorney general
18  Seth Schalit and appellate attorney Stephen Bedrick. Mr. Schalit represented California until
19  June 2006 in the federal proceedings in this matter. Mr. Bedrick represented petitioner in his
20  state appellate claims to the California Supreme Court. Both Mr. Schalit and Mr. Bedrick had
21  spoken with Attorney Beles on the telephone in previous litigation on this ineffective assistance
22  of counsel claim. Both were asked whether they could recall Attorney Beles ever mentioning
23  anything about a false alibi. Mr. Schalit could not recall whether Attorney Beles had mentioned
24  the false alibi or whether he had asked Attorney Beles about it. Mr. Bedrick admitted that
25  Attorney Beles, consistent with the testimony summarized above, had stated Ms. Wade said

---

[6] Attorney Beles also thought it would be problematic to call Ramont Johnson as an alibi witness. There were three other young African-American males sighted in the white car with petitioner on the night of the shooting. To present a case based on this alibi evidence would place petitioner too close to the crime scene with a person who also lived in Geraldine Ford's apartment building. At the time, Mr. Johnson was also on parole.

13

petitioner had wanted her to testify to a false alibi. This conversation occurred more than six years ago.

The parties stipulated to the admission of the deposition of Alyce Sandbach, the trial prosecutor. She was out of the country during the evidentiary hearing. Ms. Sandbach described how she would have dealt with the evidence in petitioner's declarations. Ms. Sandbach would have used the Wade testimony just as Attorney Beles had feared — to corroborate what she had tried to prove circumstantially — that petitioner was in the immediate vicinity of the crime scene at the time of the shooting. She knew that there were a number of different ways one could have driven the route between Geraldine Ford's apartment and the crime scene. She thought it was about a six-minute drive between the location of the shooting and Geraldine Ford's apartment (Sandbach Dep. at 47).

With regard to Ms. Wade, Ms. Sandbach offered a number of ways to discredit her. She was aware of the romantic nature of Ms. Wade's relationship with petitioner. She would have suggested to the jury that Ms. Wade had compressed the timing of her story to manufacture an alibi for her boyfriend (*id*. at 29). She would also have asked Ms. Wade about an empty assault-weapon case which was found at the residence Ms. Wade shared with petitioner. Of additional interest would have been the bullet-proof vest petitioner was wearing on the night of his arrest (*id*. at 27). Ms. Sandbach would have impeached Ms. Wade with her police statements if Ms. Wade had tried to testify differently (*id*. at 26).

**ANALYSIS**

The Ninth Circuit remanded for a determination whether petitioner had ineffective assistance of counsel because of Attorney Beles' failure to present alibi evidence at petitioner's trial. The Sixth Amendment guarantees criminal defendants the right to effective assistance of trial counsel. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). Ineffective assistance of counsel claims are evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *First*, "the defendant must show that

14

1  counsel's representation fell below an objective standard of reasonableness." A defendant
2  "must identify the acts or omissions of counsel that are alleged not to have been the result of
3  reasonable professional judgment." Judicial scrutiny of counsel's performance must be highly
4  deferential and must "indulge a strong presumption that counsel's conduct falls within the wide
5  range of reasonable professional assistance." Petitioner bears the burden of overcoming the
6  presumption that counsel's actions were in accordance with sound trial strategies. *Second*, the
7  petitioner must demonstrate prejudice by showing that counsel's errors were so serious as to
8  deprive him of a fair trial. A "reasonable probability" that counsel's failures prejudiced the
9  outcome is a probability sufficient to undermine confidence in the outcome. *Id.* at 687–90, 694.

### 1. COUNSEL PERFORMED CAPABLY.

The first prong of the *Strickland* test is often referred to as the "effectiveness" prong. *Jennings v. Woodford*, 290 F.3d 1006, 1012 (9th Cir. 2002). "To establish ineffectiveness, a defendant must show that counsel's representation fell below an objective standard of reasonableness." *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). "Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999). If counsel's decision is motivated by sound trial strategy, it cannot be considered deficient. *Hovey v. Ayers*, 458 F.3d 892, 904 (9th Cir. 2006).

As stated, petitioner's alibi theory has two themes: *One*, he could not have killed Freddie Williams because he was with Ramont Johnson at the time in question. *Two*, answering Lakeisha Wade's phone call shortly after the shooting showed that petitioner was at the apartment at the time in question.

Theme One fell away, however, because Ramont Johnson repudiated his lawyer-prepared statement that he was with petitioner all afternoon. Mr. Johnson testified that petitioner *could have* left the apartment building and driven off without Mr. Johnson's knowledge. He was with petitioner only off and on that day by his own admission. Mr. Johnson proved to be zero help to any alibi.

15

Theme Two proved to be a "non-alibi alibi," as Attorney Beles called it. Without repeating all the flaws, it is sufficient to say that Attorney Beles had sound reasons for rejecting the defense, including the key fact that the story hurt more than it helped. It placed petitioner close to the scene of the murder and to the burned car that was used in the crime. The concerns about placing petitioner near the scene of the crime and the other circumstantial evidence that the alibi defense would have raised are dispositive of the effectiveness inquiry. Attorney Beles' concerns that petitioner asked Ms. Wade to give a false alibi formed an independent and adequate basis for Attorney Beles' decision not to call her.

In the Court's judgment, Attorney Beles did an excellent job in defending petitioner. He determined that, strategically, the best decision was to argue that the prosecution had not proven its case beyond a reasonable doubt. The prosecution's evidence largely consisted of prior inconsistent statements. The prosecution's "star" witnesses refused to testify or asserted they did not remember what had happened that day because they were high.

Attorney Beles considered the alibi evidence but made a reasoned decision to avoid the alibi strategy. Attorney Beles had an independent and highly important reason to keep Ms. Wade off the witness stand — petitioner had asked her to create a false alibi for him. Attorney Beles was faced with a choice that really amounted to no choice at all: Either calling Ms. Wade and breaking the law, as well as his ethical responsibilities as an attorney, by suborning perjury if she lied on the stand, *Nix v. Whiteside*, 475 U.S. 157, 166 (1986), *or* calling Ms. Wade and having her potentially expose his client's questionable moral character. Again, the Court finds that Ms. Wade did tell Attorney Beles that petitioner had asked her to falsify an alibi.

Petitioner's attack on the truthfulness of Attorney Beles is based on two telephone conversations. As stated, Attorney Beles spoke with Mr. Bedrick in preparation for petitioner's habeas petition to the California Supreme Court in 2000. During that conversation,

1   Attorney Beles made two statements that turned out to be in error.[7]  These incorrect
2   recollections, however, were understandable given the circumstances of the phone call, having
3   been made five years after the trial when memories were not so sharp.  Furthermore, there were
4   a number of *other* issues at stake including claims based upon alleged juror misconduct and
5   alleged plea negotiations.  This alibi claim was only one of many items raised.
6   Significantly, Mr. Bedrick admitted that Attorney Beles had told him that Ms. Wade said
7   petitioner wanted her to testify to a false alibi.  He made such a note on his file folder at the
8   time.  The note was in the same ink as other items on the folder.  Attorney Beles' recollection is
9   corroborated by the fact that he (as she admitted) referred Ms. Wade to separate counsel so that
10  she could be advised on taking the Fifth Amendment and thus not be able to testify for the
11  prosecution.

12  Petitioner argues that Attorney Beles provided ineffective assistance of counsel because
13  he failed to execute his duty to investigate the alibi evidence.  Counsel has a duty to make
14  reasonable investigations or to make a reasonable decision that would render an investigation
15  unnecessary.  *Strickland*, 466 U.S. at 691.  The duty to investigate, however, is not limitless.
16  Not every conceivable witness needs to be interviewed.  *Hendricks v. Calderon*, 70 F.3d 1032,
17  1040 (9th Cir. 1995).  A lawyer who does not adequately investigate and introduce evidence
18  that either actually demonstrates or raises sufficient doubts as to his client's innocence has
19  rendered deficient performance to his client when it undermines confidence in the ultimate
20  verdict.  *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (citing *Hart v. Gomez*, 174 F.3d
21  1067, 1070 (9th Cir. 1999)).

22  Plainly, Attorney Beles investigated adequately to ascertain that it would have been
23  unwise to call Ms. Wade as a witness.  Once that judgment was made, further investigation of
24  any alibi defense was pointless, for the round-robin theory had Ms. Wade at its center as a
25  critical witness.

---

[7] The two incorrect statements Attorney Beles told Mr. Bedrick were (1) that Ms. Bello had first called Doris McCullough, Ms. Wade's mother, when in fact she called Ms. Wade, and (2) that Ms. Wade had told him that petitioner had admitted the crime to her.

17

In conclusion, petitioner has not proven deficient performance by Attorney Beles. Next, this order will nonetheless analyze the second prong of the *Strickland* test assuming *arguendo* that petitioner could meet the first effectiveness prong.

### 2.   INSUBSTANTIAL PREJUDICE.

In order to prevail on an ineffective assistance of counsel claim, petitioner must prove *both* that counsel's performance was deficient and that this deficiency affected the ultimate outcome. The petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Riley v. Payne*, 352 F.3d 1313, 1319 (9th Cir. 2003) (quoting *Strickland*, 466 U.S. at 694).

The outcome in this case would not have been affected by the introduction of the alibi evidence in question. The alibi would have done more harm than good, as shown.

Petitioner's citations are unavailing. In *Avila*, defense counsel had failed to investigate or introduce evidence that someone else had been the shooter. *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002). Specifically, neither defense counsel nor his investigator spoke to witnesses because they believed those witnesses might not cooperate or make the 'best appearance' at trial (potential witnesses included gang members). *Id*. at 919–20. Likewise, in *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994), the evidence defense counsel failed to investigate was the defendant's "most important defense: that [his brother who was at the scene] was the shooter." In contrast here, petitioner's alibi evidence could have harmed his case because (1) it placed him closer to the scene of the crime, (2) if Ms. Wade testified that petitioner had asked her to fake an alibi, the jury may have inferred that petitioner had intimidated the prosecution's other witnesses who were refusing to testify, and (3) the timing of this alibi did not absolutely prove petitioner's factual innocence. Rather, the evidence suggested that petitioner was at Geraldine Ford's apartment — it did not place him miles away or establish conclusively that someone else had committed the crime. In *Avila*, a witness had told the defense lawyer that she saw the shooter. *Avila*, 297 F.3d at 920. No such witness was available here.

18

Petitioner relies on decisions where the evidence in question involved a credible partial alibi rather than a conclusive alibi. *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002), *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998). Here, however, the alibi part was very weak and the downsides most formidable.

This alibi evidence does not prove petitioner's factual innocence or raise sufficient doubts as to his factual innocence. Accordingly, it cannot undermine confidence in the jury's verdict convicting him of the murder of Freddie Williams.

The defense played the hand as well as it could be played. To have tried to play the alibi card would have, in the Court's judgment, been a mistake that would have made conviction all the more likely. Attorney Beles' decision to not put on this alibi evidence was based on strategy and was eminently reasonable.

## CONCLUSION

For the reasons stated, the petition for writ of habeas corpus is **DENIED**. The Clerk **SHALL CLOSE THE FILE**.

**IT IS SO ORDERED.**

Dated: December 7, 2006.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE